**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEANNA DORNBACH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:20-CV-36 RLW |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Deanna Dornbach brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying her applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq.  For the reasons that follow, the decision of the Commissioner is reversed and remanded for further proceedings consistent with this Memorandum and Order.

### I.  Procedural History

Plaintiff filed her application for SSI on October 5, 2017, and on October 6, 2017, she filed an application for DIB. (Tr. 250-57).  Plaintiff alleged she has been unable to work since April 29, 2016, due to major depressive disorder, plantar fasciitis, fibromyalgia, restless leg syndrome, panic disorder, and degenerative disc disease. (Tr. 260). Plaintiff's application was denied on initial consideration and she requested a hearing before an Administrative Law Judge ("ALJ").  Plaintiff and counsel appeared for an initial hearing on May 1, 2019. (Tr. 33-71).  Plaintiff testified concerning her disability, daily activities, functional limitations, and past work.  Id.  The ALJ also received testimony from vocational expert ("VE") Jenifer Larue.  Id.  On May 23, 2019, the ALJ

issued an unfavorable decision finding Plaintiff not disabled. (Tr. 12-32). On June 10, 2019, Plaintiff filed a request for review of the ALJ's decision with the Appeals Council. (247-49). On November 12, 2019, the Appeals Council denied Plaintiff's request for review. (Tr. 1-6).

In this action for judicial review, Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, Plaintiff argues that in reaching his conclusion that she could perform a full range of light work, the ALJ relied on opinions from non-treating medical sources that were outdated and not based on review of the entire record. Plaintiff also argues that the ALJ's RFC assessment was conclusory and does not contain any rationale or reference to supporting evidence. Plaintiff requests that the decision of the Commissioner be reversed and the matter be remanded for an award of benefits or for further evaluation.

With regard to Plaintiff's testimony, medical records, and work history, the Court accepts the facts as presented in the parties' respective statements of facts and responses. The Court will discuss specific facts relevant to the parties' arguments as needed in the discussion below.

## II. Legal Standard

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.   If the claimant is working, disability benefits are denied.   Second, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, then he is not disabled.   Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1, the claimant is considered disabled, regardless of age, education, and work experience.  20 C.F.R. §§ 416.920(a)(4)(iii), (d).

At the fourth step, if the claimant's impairment is severe but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(5)(i).  An RFC is "defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011); see also  20 C.F.R.  § 416.945(a)(1).  Ultimately, the  claimant  is responsible for providing evidence relating to his RFC, and the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3).  If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv).

In the fifth step, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production shifts to the Commissioner to show the claimant maintains the RFC to perform work that exists in significant numbers in the national economy.  See Brock v. Astrue, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work which exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. Id. In the fifth step, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. Hensley, 829 F.3d at 932.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted.  Under this test, the Court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." Reece v. Colvin, 834 F.3d 904, 908 (8th Cir. 2016). The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and

substantial evidence." Id. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." KKC ex rel. Stoner v. Colvin, 818 F.3d 364, 370 (8th Cir. 2016).

### III. The ALJ's Decision

In a decision dated May 23, 2019, the ALJ applied the above five-step analysis and found Plaintiff had not engaged in substantial gainful activity since April 29, 2016; Plaintiff has the severe impairments of major depressive disorder, post-traumatic stress disorder ("PTSD"), degenerative disc disease of the lumbar spine, and obesity (Tr. at 17); and Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 18).

As for Plaintiff's RFC, the ALJ found Plaintiff retained the ability to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[1] but that she had the following additional functional limitations:

> [S]he can only occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; should avoid concentrated exposure to extreme cold and extreme heat, even moderate exposure to whole body vibrations, should avoid working at unprotected dangerous heights or around dangerous machinery; and is limited to simple, routine work with no close interactions with the public.

(Tr. 21).

At the fourth step, the ALJ found Plaintiff was unable to perform her past relevant work. (Tr. 25). At the fifth step, relying on the testimony of the VE and considering Plaintiff's age,

---

[1] Light work involves lifting no more than 20 pounds with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567. To be considered capable of performing light work, a claimant must be able to do "a good deal of walking or standing." Id. The Eighth Circuit recognizes that "'[l]ight work requires that a claimant be capable of standing or walking for a total of six hours out of an eight-hour workday." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995).

education, work experience, and RFC, the ALJ found there were jobs existing in significant numbers in the national economy which the Plaintiff could perform, including representative occupations such as an electrical assembler, mail clerk, or merchandise marker.  (Tr. at 26).  At the end of his analysis, the ALJ concluded Plaintiff was not disabled.  (Tr. 27).

## IV. Discussion

In her Brief in Support of Complaint, Plaintiff argues the ALJ did not make his RFC determination based on substantial evidence in the record.  Specifically, she faults the ALJ for relying on the opinions of Drs. Spence and Thorson, non-examining medical sources, who, Plaintiff maintains, did not review the entire record and rendered their opinions more than a year prior to the ALJ's decision.  Plaintiff also faults the ALJ for failing to provide an adequate explanation as to why he found these two opinions to be persuasive, as opposed to the four other medical opinions in the record, three of whom were from treating medical sources.  Defendant responds that the ALJ properly evaluated the medical opinions and findings in the record under the new regulations.

### A. Applicable Law

For claims like Plaintiff's that are filed on or after March 27, 2017, an ALJ evaluates medical opinions and administrative medical findings pursuant to 20 C.F.R. § 404.1520c.  These new rules provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [Plaintiff's] medical sources." 20 C.F.R. § 404.1520c(a).  An ALJ is to evaluate the persuasiveness of medical opinions and prior administrative medical findings in light of the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant, which includes: (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship,

6

and (v) examining relationship; (4) specialization, and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies." 20 C.F.R. § 404.1520c(a)-(c).

Under the new regulations, supportability and consistency "are the most important factors" to consider when determining the persuasiveness of a medical source's medical opinions and, therefore, an ALJ must explain how he considered the factors of supportability and consistency in his decision.[2] 20 C.F.R. § 404.1520c(b)(2). An ALJ may, but is not required to, explain how he considered the remaining factors. Id.; see also Brian O. v. Comm'r of Soc. Sec., No. 1:19-CV-983-ATB, 2020 WL 3077009, at *4 (N.D.N.Y. June 10, 2020) (quoting 20 C.F.R. § 404.1520c(a), (b)) ("Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how he or she considered the medical opinions' and 'how persuasive he or she finds all of the medical opinions.'" (alterations omitted)).

**B. ALJ's Evaluation of Opinion Evidence Regarding Plaintiff's Physical Impairments**

Plaintiff argues that the ALJ erred by failing to properly evaluate the opinion evidence from Dr. Spence, a non-examining, consultive physician. Defendant responds that the ALJ properly evaluated the persuasiveness of Dr. Spence's administrative medical findings under the new regulations, and the Court agrees.

---

[2]"Supportability" refers to the principle that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" refers to the principle that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

On November 22, 2017, agency medical consultant Paul Spence, M.D., reviewed the evidence of record as of that date, including Plaintiff's self-reported limitations, diagnostic studies of her lumbar spine from 2017, and medical records from Plaintiff's primary care physician, Sri Kolli, M.D., and her physical medicine specialist, Alexander Beyzer, M.D. (Tr. 151). Based on a review of these records, Dr. Spence found Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours in an 8-hour workday and sit for 6 hours; she could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; should avoid concentrated exposure to extreme cold and heat; and should avoid even moderate exposure to vibration and hazards (Tr. 149-51). The ALJ found Dr. Spence's opinion, which was limited to Plaintiff's physical impairments, persuasive because it was "consistent with the record as a whole, as discussed above." (Tr. 24). The ALJ incorporated all of Dr. Spence's findings as to Plaintiff's physical limitations in making the RFC determination in step 4 of his decision.

In making his RFC determination, the ALJ summarized many of Plaintiff's medical records, including treatment notes, testing, and imagining results. The ALJ characterized Plaintiff's physical exam results with regard to her back as either remaining the same or slightly improving from May 2016 through June 2017. (Tr. 22). The ALJ noted that in May 2016, Plaintiff presented with lower back pain exacerbated by motion, walking, and standing. Plaintiff demonstrated tenderness to palpitation of the lumbar spine, diminished reflexes, and antalgic gait, but she had full motor strength, ambulated unassisted, and straight leg raise test was negative. The ALJ noted Plaintiff was diagnosed with degeneration of the lumbar or lumbosacral intervertebral disc, lumbosacral spondylosis without myelopathy, and displacement of the lumbar intervertebral disc without myelopathy. The ALJ noted Plaintiff's back pain was relieved with physical therapy and medication, Percocet. The ALJ wrote that "[Plaintiff]'s complaints, exam results, diagnosis,

and treatment remained essentially the same or improved through May 2019." (Tr. 22). He noted Plaintiff's pain level fluctuated from 5-7/10, although she consistently demonstrated a full range of motion, negative straight leg test, full motor strength at 5/5, and intact reflexes and sensation; and from 2018-19, there was evidence in the medical records that she had a normal gait. (Tr. 22). The ALJ did note that imaging results of Plaintiff's back showed "slightly worsening degenerative disc disease since the alleged onset of disability." But the ALJ characterized Plaintiff's treatment as conservative noting that she was treated with Percocet, nonsteroidal anti-inflammatory drugs, stretching exercises, and recommended weight loss.

The Court agrees with the Commissioner that the ALJ conducted a thorough review of Plaintiff's physical examination findings and diagnostic studies for the entire relevant period. The Court finds the ALJ's conclusions regarding Plaintiff's physical impairments are supported by examination findings from multiple providers throughout the relevant period. (Tr. 382-91, 423, 431-32, 602-15). Although Plaintiff complained of having no ability to stand/walk, the only provider who documented an antalgic gait was Dr. Beyzer. (Tr. 382-91, 602-15). Records from other providers throughout 2018 and 2019 consistently documented a normal gait and station. The ALJ's findings regarding Plaintiff's physical impairments are also supported by the fact that Plaintiff reported to her mental health providers that she took long walks, went hiking, and worked in her garden. (Tr. 431-32, 610, 614, 631, 636, 642-45, 649, 654, 659, 662, 667,675, 694). The Court finds that the reasons given by the ALJ to find Dr. Spence's opinion persuasive as to Plaintiff's functional limitations were adequate, and his RFC determination with regard to her physical impairments is supported by substantial evidence on the record as a whole.

### C. ALJ's Evaluation of Opinion Evidence Regarding Plaintiff's Mental Impairments

Plaintiff also argues the ALJ's RFC determination regarding her mental impairments is not supported by the record as a whole.  Plaintiff faults the ALJ for failing to properly evaluate the opinion evidence from Dr. Thorson, a non-examining, consultive psychologist.  Plaintiff argues the ALJ improperly relied on the opinion of Dr. Thorson while rejecting the opinions of Jeffery Pevnick, M.D., Plaintiff's treating psychiatrist, and Andrea Crawford, PMHNP-BC, a treating psychiatric nurse practitioner from BJC Behavioral Health.

At the outset, the Court notes that Plaintiff's Brief in Support of Complaint cites to case law that is inapplicable to the new regulations addressing the persuasiveness and weight of medical opinions.  The Court finds, however, that under the new regulations, the ALJ failed to properly support the weight he assigned to medical opinions concerning Plaintiff's mental impairments, and that his conclusions regarding the impact Plaintiff's mental impairments have on her RFC are not substantially supported by the record as a whole.

### 1.  Dr. Thorson's Opinion

On January 8, 2018, agency psychological consultant Darline Thorson, Ph.D., reviewed some of the evidence in the record as of that date, including Plaintiff's self-reported limitations and daily activities, some medical records from her primary care physician, Sri Kolli, M.D., and the consultative examination performed by Dr. Leonburger in late 2017. (Tr. 147-48).  Notably, Dr. Thorson did not review records from Plaintiff's treating psychiatrist, Dr. Pevnick.  Dr. Thorson found Plaintiff had moderate limitations in the four mental functioning domains: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 147).  Dr. Thorson concluded Plaintiff could understand, remember, and carry out simple work; she could interact

adequately with peers and supervisors but would do best with limited interpersonal demands; and she could adapt to most common changes in a competitive work setting (Tr. 153).

The ALJ indicated he found Dr. Thorson's opinion persuasive and he relied on her opinion when determining Plaintiff's mental impairments in the third and fourth steps of his analysis.  The ALJ wrote:

> The state agency psychologist, Darline Thorson, Ph.D., opined in January 2018, after review of the claimant's medical records, that she had moderate limitation in all four mental functioning domains, that is, in her ability to understand, remember, and apply information; interact with others; concentrate, persist, and maintain pace; and adapt and manage herself.  Dr. Thorson further opined that the claimant retained the ability to understand, remember, and carry out simple instructions, maintain adequate attendance and sustain an ordinary routine without special supervision, interact adequately with peers and supervisors, but would do best with limited interpersonal demands, and can adapt to most usual changes common to a competitive work setting.  Dr. Thorson's opinion is persuasive as it is consistent with the record as a whole, as discussed above.

(Tr. 24) (internal citations to the record omitted). Dr. Thorson's findings, however, were based on review of limited medical records and they contradict the opinions of at least two treating medical sources.

When evaluating medical opinions and determining persuasiveness, the new regulations require an ALJ to explain how he considered the factors of supportability and consistency in his or decision. 20 C.F.R. §404.1520c(b)(2).  Here, the ALJ stated that Dr. Thorson's opinion was "consistent with the record as a whole," yet he failed to address many inconsistencies contained in Dr. Thorson's findings.  (Tr. 24).  As for the second important factor, supportability, the ALJ does not explain how he considered the factor at all.

As Plaintiff points out, in forming her opinion, Dr. Thorson reviewed a limited amount of medical records.  She had some records from Dr. Kolli, Plaintiff's primary care physician, and the exam record and opinion from Dr. Leonburger, a consultive psychologist.  She did not, however, have records from Dr. Pevnick, Plaintiff's treating psychiatrist.  Based on the records

she had, Dr. Thorson characterized Plaintiff's treatment for depression as "sporadic" and "infrequent," and she remarked that it appeared Plaintiff was only being prescribed antidepressants by her primary care physician. (Tr. 147). These statements are not supported by the record.

At the time, Plaintiff was seeing a psychiatrist, Dr. Pevnick, and her treatment was not sporadic. The records show Plaintiff visited Dr. Pevnick nine times between May 2016 and October 2018. (Tr. 595). In Dr. Pevnick's progress notes, he often described Plaintiff as disheveled in appearance, tearful, upset, anxious, depressed, paranoid, and with thoughts consumed with feelings of helplessness, hopelessness, and low self-worth. (Tr. 578-95). Dr. Pevnick described Plaintiff as having poor insight and judgment. (Tr. 639, 656). He noted Plaintiff suffered continued trauma due to abuse by a former boyfriend, childhood sexual abuse, and carrying a baby to term when she was 14 years old. (Tr. 656, 589). Dr. Pevnick prescribed Plaintiff various medications including Sertraline, Brintellix, Bupropion and Venlafaxine (antidepressants); amphetamine/dextroamphetamine (a stimulant); Alprazolam (anti-anxiety medication); and Zolpidem (a sleep aid).[3] (Tr. 575-95). There is also evidence that Plaintiff was not stable on her prescribed medications. There were notations in the record where Dr. Pevnick changed the medications or dosages because they were having limited results. Id. Dr. Thorson had none of this information when making her findings, and the ALJ failed to address the significant inconsistencies in the record between Dr. Thorson's conclusions and Dr. Pevnick's medical records.

It is also significant that the only mental impairment Dr. Thorson found Plaintiff to have was depression. (Tr. 147). This is inconsistent with and not supported by the record. Plaintiff

---

[3]Plaintiff was also prescribed Abilify, an antipsychotic, by her psychiatric nurse practitioner at BJC Behavioral Health. (Tr. 626).

was also diagnosed with PTSD.  (Tr. 626, 716).  The ALJ found Plaintiff's PTSD was severe, but in determining what Plaintiff can still do despite her mental impairments, the ALJ relied on the medical opinion of a non-treating psychologist who did not account for the fact that Plaintiff has PTSD.  Moreover, the ALJ failed to address this inconsistency when he relied on Dr. Thorson's opinion to the exclusion of other medical opinions from treating sources.

Defendant argues it is of no import that Dr. Thorson did not have medical records from Dr. Pevnick or Ms. Crawford because Plaintiff's mental condition did not deteriorate following Dr. Thorson's review.  This argument is not persuasive.  The issue is not whether subsequent medical evidence showed that Plaintiff became more impaired, but whether Dr. Thorson had adequate and accurate medical information to begin with.   In other words, did Dr. Thorson have adequate information to form a medical opinion with regard to Plaintiff's mental impairments?  The Court finds she did not.  Without evidence from Plaintiff's treating psychiatrist, Dr. Thorson had little to no medical evidence regarding Plaintiff's mental health or treatment when she made her findings. And, as discussed above, the "facts" on which Dr. Thorson based her findings that Plaintiff's treatment for depression was "sporadic" and "infrequent," and that Plaintiff was only being prescribed antidepressants by her primary care physician, were contradicted by Dr. Pevnick's treatment records.

Under the new regulations, an ALJ must explain how he considered the factors of supportability and consistency in determining the persuasiveness of medical opinions. See 20 C.F.R. § 404.1520c.  In weighing the opinion of Dr. Thorson, the ALJ failed to address either of these factors, let alone Dr. Thorson's relationship with Plaintiff, her specialization, or other factors, such as her familiarity with disability program polices. See 20 C.F.R. § 404.1520c(a)-(c).  The ALJ summarily concluded Dr. Thorson's opinion was persuasive because it was "consistent with the record as a whole." (Tr. 24).  Dr. Thorson, however, formed opinions about what Plaintiff can

do despite her mental health impairments without having seen critical records from Plaintiff's mental health provider.  Dr. Thorson's opinion was not consistent with the record as a whole in many significant respects, and the ALJ failed to address these inconsistencies.

For these reasons, the Court finds the ALJ failed to properly evaluate the persuasiveness of Dr. Thorson's opinion under 20 C.F.R. § 404.1520c, which is reversible error.  Lucus v. Saul, 960 F.3d 1066, 1069 (8th Cir. 2020) ("failure to comply with SSA regulations is more than a drafting issue, it is legal error"), Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2003) (contrasting a "mere drafting oversight" with the "failure to follow . . . [t]he Commissioner['s] duly promulgated regulations").

### 2.  Opinions from Treating Medical Sources

Plaintiff also objected to the weight the ALJ assigned the opinions of her treating medical sources.  The ALJ relied on the opinion of Dr. Thorson while discounting the opinions of two treating medical sources who specialized in mental health: Dr. Pevnick, a psychiatrist, and Andrea Crawford, a psychiatric nurse practitioner from BJC Behavioral Health.  The ALJ found neither of these sources' opinions persuasive.

On April 4, 2019, Dr. Pevnick completed a medical source statement outlining Plaintiff's limitations from a mental health standpoint.  Dr. Pevnick opined that Plaintiff had marked interference in her ability to maintain the necessary concentration to persist at simple routine tasks eight hours a day, five days per week, and had a marked limitation in her ability to ignore or avoid distractions.  Plaintiff's overall pace of production would be 31% or more below average with marked limitation in her ability to use reason and judgment to make work-related decisions; function independently; regulate emotions; control behavior; maintain well-being at work; or respond appropriately to requests, criticism, suggestions, correction, and challenges. Dr. Pevnick also felt that Plaintiff could not perform in proximity to co-workers without being distracted by

them or without distracting them due to exhibition of abnormal behavior, and could not consistently perform for supervisors without exhibiting insubordinate behavior in response to supervision.  As a result of these symptoms and limitations Dr. Pevnick opined that Plaintiff would likely be late to work or need to leave early three times or more per month and would need to be absent three or more days a week. (Tr. 566-568).

The ALJ discounted Dr. Pevnick's April 2019 opinion on the basis that it "is not persuasive as it is insufficiently supported by the record as a whole, as discussed above." (Tr. 25).  But in the preceding section of his decision, the ALJ did not discuss Dr. Pevnick's treatment notes, findings, records from his practice, or his relationship with Plaintiff, other than to write:  "Medical records indicate that [Plaintiff] sought psychiatric treatment about nine times from May 2016 through 2018 and often presented disheveled, with anxious or depressed mood, passive suicidal ideation, and fair insight and judgment, but was described as cooperative and no problems with temper control." (Tr. 20).  The ALJ does not explain in this one-sentence summary how Dr. Pevnick's opinion was inconsistent or not supported by the record, as he was required to do under the new regulations. See 20 C.F.R. § 404.1520c(a)-(c).

The ALJ also discounted the May 1, 2018 opinion of Plaintiff's treating psychiatric nurse practitioner Andrea Crawford, PMHNP-BC, who completed a mental residual functional capacity questionnaire outlining Plaintiff's mental limitations.  Ms. Crawford opined that Plaintiff had marked interference with her ability to maintain the necessary concentration to persist at simple routine tasks eight hours a day, five days per week, with marked limits in her ability to initiate and complete tasks in a timely manner, ignore or avoid distractions, or sustain ordinary routine and regular attendance.  Her overall pace of production would be 11-20% below the average. (Tr. 713). Plaintiff had marked limitations in her ability to use reason and judgment to make work-related decisions and to understand and learn terms, instructions, and procedures. She was also limited in

her ability to work a full day without needing more than the allotted number or length of rest periods, to distinguish between acceptable and unacceptable work performance, and to regulate emotions, control behavior, and maintain her wellbeing in a work setting.  In interacting with others, Ms. Crawford opined Plaintiff would have marked limits in her ability to keep social interactions free of excessive irritability, argumentativeness, sensitivity, or suspiciousness; maintain socially acceptable behavior; or respond appropriately to requests, criticism, suggestions, correction, and challenges. (Tr. 714).  She further opined that Plaintiff could not perform in proximity to coworkers or the general public. (Tr. 715). As a result of those limitations, Plaintiff would likely be late or have to leave early three or more times a month and would be absent three or more times a month due to symptoms of depression. (Tr. 715). Ms. Crawford wrote that Plaintiff "has symptoms of depression where it is difficult to even get out of bed." (Tr. 715).  Ms. Crawford supported her opinion by writing that Plaintiff "frequently will become tearful when overwhelmed, she has frequent periods of low moods, lack of energy, and motivation." (Tr. 716).  She also wrote that Plaintiff "has problems sustaining her concentration and attention."  Id.

In rejecting Ms. Crawford's opinion, the ALJ stated Ms. Crawford's opinion "is not persuasive as it is inconsistent with the record as a whole, as discussed above." (Tr. 24).  In the preceding section, however, the ALJ did not discuss Ms. Crawford's treatment notes, findings, records from her practice, or her relationship with Plaintiff other than to write a one-sentence summary.  He noted mental status exams from BJC Behavioral Health "generally showed the claimant was fairly well-groomed, cooperative, with normal speech, but poor insight and judgment and depressed mood." (Tr. 19).

The ALJ's cursory summary of the BJC Behavioral Health reports is not entirely inaccurate, but it fails to reflect Ms. Crawford's findings that Plaintiff is markedly impaired in some areas.  Ms. Crawford did describe Plaintiff as having poor insight and judgment and

depressed mood, and sometimes described her as being "fairly well-groomed," cooperative, and with normal speech.  But Ms. Crawford also described how Plaintiff "frequently will become tearful when overwhelmed, she has frequent periods of low moods, lack of energy, and motivation." (Tr. 716).  There were notations throughout the BJC Behavioral Health records that Plaintiff was tearful, crying, and emotional, and that she was overwhelmed, wanted to die, and lacked motivation to even get out of bed. (Tr. 620, 623, 626).  During some visits, Plaintiff reported doing she was better, but there was not an overall trend showing Plaintiff was improving or deteriorating.  Instead, Plaintiff's mental health symptoms waxed and waned, which is not unusual.  Lillard v. Berryhill, 376 F. Supp. 3d 963, 984 (E.D. Mo. 2019) ("recognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation.") (citing Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996)); see also Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.").  Thus, Plaintiff's stable and less stable periods as reflected in the medical records are consistent with chronic mental disability, and with Ms. Crawford's opinion that Plaintiff has marked limitations in some areas, including regulating her emotions, controlling her behavior, keeping pace, responding appropriately to requests, criticism, suggestions, correction and challenge, and maintaining attendance.  In discounting Ms. Crawford's opinion, the ALJ did not specifically address how her opinion was inconsistent with or not supported by the record, which he was required to do under the new regulations.  See 20 C.F.R. § 404.1520c(a)-(c).

In sum, the Court finds the ALJ failed to follow the regulations and properly evaluate the persuasiveness of Dr. Pevnick's and Ms. Crawford's opinions under 20 C.F.R. § 404.1520c, which is reversible error. Lucus, 960 F.3d at 1069; Brueggemann, 348 F.3d at 694.

### D.  The ALJ's Evaluation of Plaintiff's Mental Impairments on her RFC

Plaintiff argues that the ALJ's RFC determination with regard to her mental impairments is not supported by the record as a whole because it relies entirely on Dr. Thorson's opinion, which should have been discredited.  Defendant responds that the ALJ's RFC determination is supported by evidence in the record as a whole, and that in making his determination, the ALJ considered medical evidence as well as reports from the Plaintiff herself.

When determining Plaintiff's RFC in step four, the ALJ did not address Plaintiff's mental impairments, aside from summarizing the medical opinions and assigning them weight.  He then adopted the limitations set forth in Dr. Thorson's opinion, which included findings that Plaintiff retained the ability to concentrate and maintain pace, interact appropriately with supervisors and co-workers, manage herself and regulate her emotions, and carry out simple instructions and maintain attendance.  The only mental limitations the ALJ placed on Plaintiff's RFC was that she was "limited to simple, routine work with no close interactions with the public."  (Tr. 21).

As Defendant points out, the ALJ did address Plaintiff's mental impairments and medical records in step three when determining whether her impairments met the presumptively disabling impairments listed in 20 C.F.R., Part 404, Subpart A, Appendix 1, and the ALJ referred back to this discussion in step four.  Defendant argues the ALJ's discussion in step three regarding Plaintiff's mental health impairments supports his RFC determination, which ultimately is supported by substantial evidence in the record as a whole.

In step three, the ALJ made broad findings regarding how Plaintiff's mental impairments limited her in the four mental health domains: understanding, remembering, or applying

information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. The ALJ did not address specific limitations within these four categories and how Plaintiff's mental limitations impacted her ability to work in a competitive working environment. RFC is defined as the most that a claimant can still do in a work setting despite the claimant's limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96–8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis present). In making his RFC determination, the ALJ did not discuss the impact Plaintiff's mental impairments have on her ability to do sustained work activities.

For example, the ALJ found Plaintiff was moderately impaired in interacting with others based on the fact that "she can socialize with family, live with others, go camping," and that she "reported talking on to her twin sister on a weekly basis and her mother on a daily basis." (Tr. 19). The ALJ also noted that medical records indicate Plaintiff has "good rapport and interactions with providers and medical staff and that she is described as pleasant and cooperative." (Tr. 19). The fact that Plaintiff can "live with others" (referring to her husband and son) and sometimes go camping is not the same as interacting with co-workers or a supervisor in a competitive work setting. Neither is talking on the phone with one's mother or sister. Kelley v. Callahan, 133 F.3d 583, 588–89 (8th Cir. 1998) ("a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity."). As for attending church, Plaintiff testified that she occasionally attends the church across the street from her house on Sundays for about one hour. Again, this is not the same as interacting with others in a competitive working

environment for 40 hours a week.  Id.  With regard to medical records noting that Plaintiff was cooperative and pleasant, some of these notations were made by Dr. Pevnick and Ms. Crawford, providers who opined that Plaintiff had marked impairment in interacting with others in a working environment.  The ALJ did not address this discrepancy.  Moreover, brief, one-on-one interactions with treating medical providers do not equate to daily interactions with others in a working environment.

In addition, the ALJ's findings in the area of Plaintiff's ability to interact with others conflicts with Dr. Pevnick's and Ms. Crawford's opinions.  While these sources did not find marked impairments in Plaintiff's ability to interact with others generally, they both found Plaintiff would be markedly limited her in ability to respond appropriately to requests, criticism, suggestions, correction, and challenges, and Ms. Crawford also found Plaintiff would be markedly impaired in her ability to keep social interactions free of excessive irritability, argumentativeness, sensitivity, or suspiciousness; and to maintain socially acceptable behavior. Both providers felt that Plaintiff could not perform in proximity to co-workers without being distracted by them or without distracting them due to exhibition of abnormal behavior, and Dr. Pevnick opined that Plaintiff could not consistently perform for supervisors without exhibiting insubordinate behavior in response to supervision.  These are specific opinions regarding Plaintiff's ability to perform in a competitive working environment that the ALJ did not address.

Further, the Court finds there is evidence in the providers' treatment notes to support these opinions.  For example, Dr. Pevnick stated in his progress notes that Plaintiff had marked impairments in her social skills. (Tr. 578).  Dr. Pevnick noted that Plaintiff was consumed with thoughts of helplessness, hopelessness, and low self-worth, and was often tearful. (Tr. 573-96). There were notes as to Plaintiff's paranoia, flashbacks, hypervigilance, and that she was easily startled.  (Tr. 589).  Ms. Crawford made notes that Plaintiff feels people are "out to get her,"

"nobody likes her because all she does is cry," and she has anxiety and does not want to leave the house or be around people. (Tr. 625-26, 647, 653, 656, 661, 665). Ms. Crawford also noted that Plaintiff often was overwhelmed and frequently becomes tearful. (Tr. 716).

The ALJ also concluded Plaintiff was moderately impaired in her ability in adapting and managing herself because she "can handle self-care and personal hygiene, care for children, camp, and attend church," and is able "to prepare simple meals and light housework." (Tr. 20). These observations do not support the ALJ's RFC assessment.

First, some of the observations are not supported by the record. The evidence is varied regarding Plaintiff's hygiene and self-care. In treatment notes, Plaintiff was sometimes described as well-groomed but in other records was consistently described as "disheveled." (Tr. 573-96). The ALJ noted in his decision that Dr. Pevnick described Plaintiff as disheveled, but failed to reconcile this fact with his finding that Plaintiff has good hygiene. As for managing the care of children, Plaintiff is partly responsible for the care of one child, her son, who is autistic. There are numerous notations in the record that indicate Plaintiff is overwhelmed as a caregiver for her child and is not managing. (Tr. 635, 644, 650-53). Plaintiff sought professional help caring for her son, including seeking placement outside the home. (Tr. 672). The ALJ does not address these facts in his decision.[4]

Second, the ALJ's findings about Plaintiff's ability in adapting and managing herself do not rebut her treating providers' opinions regarding Plaintiff's ability to regulate her emotions, control her behavior, and maintain her well-being in a work setting. Dr. Pevnick's and Ms. Crawford's opinions on this matter were more specific. Both providers opined that Plaintiff would have marked impairment in regulating her emotions, controlling her behavior, and

---

[4]The ALJ's decision states only that Plaintiff "reported the ability to care for her autistic son with the help of her husband and other family members[.]" (Tr. 21).

maintaining well-being in a work setting.  As discussed above, these findings are supported by and consistent with treatment notes, as Plaintiff was often described as being emotional, tearful, and overwhelmed during examinations.  They are also supported by notations that Plaintiff was lacking in motivation and sometimes the desire to even get out of bed.  The ALJ ignored and failed to address these medical findings.

Finally, the fact Plaintiff can prepare simple meals and do some light chores "does not constitute substantial evidence that . . . she has the functional capacity to engage in substantial gainful activity." Kelley, 133 F.3d at 589; see also Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (it is well-settled law that a claimant need not be bedridden or helpless to be found disabled).

The ALJ also found Plaintiff was moderately impaired in her ability to concentrate, persist, or maintain pace.  The ALJ noted that while Plaintiff was treated with Adderall, no diagnosis for attention deficit disorder was ever given.  This is inconsistent with the record.  Dr. Pevnick made several notations that Plaintiff was restless and distracted (Tr. 568, 569, 581, 590), and he indicated that Plaintiff has "ADHD." (Tr. 568).  And again, Dr. Pevnick and Ms. Crawford made specific findings as to Plaintiff's ability to concentrate, persist, or maintain pace in a work setting, and the ALJ failed to address these findings or establish that they were inconsistent with or contradicted by the record.

The Court finds that the ALJ's conclusions regarding the impact of Plaintiff's mental impairments on her RFC are not supported by substantial evidence in the record.  The ALJ's RFC determination improperly relied on Dr. Thorson's opinion.  Furthermore, the ALJ did not adequately support his reasoning for rejecting the treating medical sources' opinions, which specifically addressed the impact Plaintiff's mental impairments would have on her ability to function in a working environment.  Finally, the other evidence the ALJ cites in the record does

not support the RFC with regard to Plaintiff's mental impairment and her ability to perform in a competitive work setting.  The ALJ failed to properly discuss and describe how the evidence supported his RFC conclusions and failed to properly resolve material inconsistencies in the evidence of record.

### V.    Conclusion

The Court's task "is to determine whether the ALJ's decision 'complies with the relevant legal standards and is supported by substantial evidence in the record as a whole.'"  Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008)).  The Court finds that it does not in this case.  For the reasons set forth above, the Court finds the ALJ improperly evaluated under the applicable regulations the persuasiveness of the medical opinions in the record.  The Court further finds the ALJ's determination regarding the impact of Plaintiff's mental impairments on her RFC is not supported by substantial evidence in the record as a whole.  Therefore, the Court remands this matter to the Commissioner for further proceedings consistent with this Memorandum and Order.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment will accompany this Memorandum and Order.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this 24th day of March, 2021.